IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

VERNON BRANCH,

     PLAINTIFF

     vs

THE CITY OF NEW YORK, a municipal
entity, NEW YORK CITY POLICE
OFFICER JEREMY VEIT, Shield #18814,
NEW YORK CITY POLICE OFFICER KOSTA
DEMETRAKOPOULOS, Shield # 23156, NEW
YORK CITY POLICE OFFICERS "JOHN DOES"
and "SALLY ROWES", individually and
in their official capacities, NEW YORK
CITY POLICE OFFICER EMMANUEL VALERIO,
Shield # 20335, CAPTAIN ANDREW VENTRELLA,
individually and in his official
capacity, LIEUTENANT OSVALDO NUNEZ,
individually and in his official
capacity,  DEPUTY INSPECTOR JOSEPH
DOWLING, individually and in his
official capacity, SERGEANT TIMOTHY
CONLON, individually and in his
official capacity,

     DEFENDANTS

_____

11 Civ 3048(JGK)/(MHD)

PLAINTIFF'S FIRST
AMENDED/SUPPLEMENTAL
COMPLAINT [JURY TRIAL]

## I.  INTRODUCTION

1.  This is an action against the Defendant parties, individually
and collectively, for the violation of the Plaintiff's federally

guaranteed constitutional and civil rights and his rights as otherwise guaranteed under the laws and Constitution of the State of New York.

2.   This case arises out of the arrest of Plaintiff Vernon Branch on Friday, May 28, 2010 on the sidewalk in the vicinity of a vacant lot proximate to 448 West 163rd Street, Harlem, New York and the utilization of excessive unnecessary and unreasonable and unjustified force and the subsequent conditions of the Plaintiff's detention and the malicious preferral of charges and prosecution of the Plaintiff associated with the arrest.

3.   The Plaintiff seeks monetary damages for his wrongful stop and detention, and for his unlawful false arrest, and for his wrongful and unlawful custodial incarceration and for the conditions associated therewith, and for his malicious prosecution, and for subjecting him to the malicious abuse of criminal process, and for subjecting him to unnecessary and unreasonable, and unjustified and excessive force, and for subjecting him to racially discriminatory treatment, and, otherwise, for the violation of the Plaintiff's federally guaranteed constitutional and civil rights and for the violation of his rights as guaranteed under the laws and Constitution of the State of New York; and the Plaintiff seeks whatever other relief is appropriate and necessary in order to serve the interests of justice and assure that his remedy is full and complete.

## II. JURISDICTION

4.   Jurisdiction of this Court is invoked pursuant to and under

28 U.S.C. Sections 1331 and 1343 [3] and [4] in conjunction with the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

5.    Jurisdiction is also invoked pursuant to and under 28 U.S.C. Section 1367, entitled Supplemental Pendent Party and Pendent Claim Jurisdiction. The Plaintiff requests that the Court exercise its powers to invoke pendent claim and pendent party jurisdiction.

6.    The State law claims have a common nucleus of operative fact with the federally based claims and they arise out of the same transaction and occurrence giving rise to the Plaintiff's federally based claims and causes of action.

7.    The Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which the Plaintiff, while seeking monetary damages, also seeks declaratory and injunctive relief if such is deemed necessary and desirable and in the interest of justice in order to provide the Plaintiff with a full and complete remedy for the violation of his rights.

8.    This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and the laws and Constitution of the State of New York.

9.    Venue lies within this Court in as much as the Plaintiff resides within the geographic boundaries of this Court and the conduct,

about which the Plaintiff complains and for which he seeks redress for the violation of his rights, occurred within the geographic boundaries of this Court. Furthermore, the Defendants have offices for doing business in the geographic boundaries of this Court.

10. The Plaintiff has filed a Notice of Claim and otherwise submitted to a 50[h] New York State Municipal Law hearing.

### III. PARTIES

11. The Plaintiff is an African American citizen and resident of the City of New York, the County of New York, and the State of New York.

12. The Defendant City of New York is a municipal entity which exists and was created pursuant to and under the laws and Constitution of the State of New York.

13. It is believed that the City is the real party in interest in this litigation.

14. It is believed, moreover, that, when the City of New York elects to represent individual New York City police officers, officials, and managers in federal civil rights litigations where it is alleged that the City's officers, officials, and managers have engaged in unlawful and unconstitutional conduct in violation of the civil rights of an individual, the City of New York uniformly pays any judgment of damages awarded against the officers, officials, and managers –including both compensatory and punitive damage awards; and that the City uniformly pays settlements on behalf of the represented officers, officials, and managers ordinarily without requiring any

contribution by the officers, officials, and managers, to resolve the case.

15.    It is believed, moreover, that the representation/indemnification agreement entered into by the City of New York with any New York City police officer it elects to represent in such cases, requires, as a condition of the representation and indemnification, that the officer, in substance, agree that the City's interests are the paramount interests when it comes to the decisions made by the City's attorneys who are also and at the same time, the Officer's attorneys.

16.    Defendants Jeremy Veit, Shield # 18814, Kosta Demetrakopoulos, Shield # 23156, "John Does", "Mary Rowes", Emmanuel Valerio, Shield # 20335, Captain Andrew Ventrella, Lieutenant Osvaldo Nunez, Deputy Inspector Joseph Dowling, and Sergeant Timothy Conlon are New York City line and command police officers. They are sued in their individual and official capacities. Notwithstanding the wrongful and unlawful nature of their acts and conduct as hereinafter described, they were taken in and during the course of their duties and functions as employees and agents of the City of New York and incidental to the otherwise lawful performance of the same.

IV. ALLEGATIONS

17.    Plaintiff Vernon Branch is an African America citizen and resident of the City of New York, the County of New York, and the State of New York.

18.   On Friday, May 28, 2010, the date on which the incident that gives rise to this litigation commenced, the Plaintiff was thirty seven [37] years of age.

19.   The Plaintiff's birth date is May 6, 1974.

20.   The Plaintiff was born in Sydenham Hospital in Harlem, New York City, New York and raised in the Harlem community of New York City.

21.   The Plaintiff has four brothers and two sisters and he is the third oldest of his siblings.

22.   The Plaintiff attended Julia Childs High School and Lower Eastside Preparatory School.

23.   The Plaintiff received a GED.

24.   The Plaintiff attended two semesters of college.

25.   The Plaintiff has had numerous odd jobs since age fourteen including, among other positions, employment with Wendy's fast food, with D'Agostino grocery store as a delivery person, with Geico Insurance in its mail room, and with a law firm in its mail room.

26.   Prior to the incident which gives rise to this litigation, the Plaintiff had never been arrested.

27.   The Plaintiff has never been convicted of any felony or misdemeanor or any other offense.

28.   The Plaintiff presently resides with his girlfriend and her three children, the latter of whom are ages 16, 8, and 4.

29.   The Plaintiff has two children, one of whom is eleven and resides with her mother in Virginia and the other of whom is seven and

resides with her mother in Connecticut.

30. As of the date of the May 28, 2010 incident, the Plaintiff was enrolled in an apprentice program with Local 28 of the sheet metal workers union.

31. As of the date of the incident, the Plaintiff had been enrolled in the afore-described sheet metal workers apprenticeship program for approximately two years.

32. The apprenticeship program was a five year program at the conclusion of which the Plaintiff would be able to become a journeyman in the sheet metal workers Union.

33. As part of the apprenticeship program, the Plaintiff would be assigned to various job sites at which Union sheet metal workers were working.

34. On the date of the incident which gives rise to this litigation, the Plaintiff was working, as part of the sheet metal worker apprentice program in which the Plaintiff was enrolled, at a job site located at the Columbia Presbyterian Hospital Center in upper Manhattan.

35. On Friday, May 28, 2010, the date of the incident which gives rise to the litigation, the Plaintiff resided in a residence at 448 West 163rd Street, Harlem, New York City which residence was proximate to a vacant lot; and the incident, which gives rise to this litigation, took place in the vicinity of the vacant lot and by the location of the vacant lot proximate to the Plaintiff's residence.

36. The Plaintiff had moved to his then residence a short time prior to the date of the incident.

37. Prior thereto, the Plaintiff lived in that same neighborhood down the block from his then present residence and just a short distance from the proximity of the vacant lot in whose vicinity the incident, which gives rise to this litigation, commenced.

38. The incident which gives rise to this litigation commenced on Friday, May 28, 2010 at or about between 10:00 P.M. and 11:00 P.M. in the vicinity of a vacant lot proximate to 448 West 163rd Street, New York City, New York where the Plaintiff then resided.

39. At or about the time described on Friday, May 28, 2010 [the Memorial Day holiday weekend], the Plaintiff and some others, all of whom resided in the immediate area, were on the sidewalk in the vicinity of a vacant lot, proximate to Plaintiff's residence, discussing plans for a barbeque which they had regularly held, over prior years, on the Memorial Day weekend.

40. The Plaintiff and others were discussing, in conversational voice, who, among them, would do the cooking and who, among them, would bring the various items needed for the barbeque.

41. Other people were standing outside of buildings in the area proximate to the location where the Plaintiff was, with others, standing and discussing the up-coming Memorial Day barbeque.

42. At or about that time, the Plaintiff, who was facing the corner at Amsterdam Avenue, observed a marked New York City Police

vehicle pass in the area and stop at the corner and, when the light changed, drive off and, then, abruptly turn and come back and stop in the vicinity of where the Plaintiff and the several others were standing and discussing, in conversational voices, their plans for the up-coming Memorial Day weekend holiday barbeque.

43. Among the several individuals the Plaintiff recalls being present at the location, were the Plaintiff, Michael Hodges, Ambers Jackson, James Johnson (the Plaintiff's younger brother), and it is believed Jose Vargas.

44. The Plaintiff and the others had been at the location for only a very brief period, perhaps five or ten minutes, when the afore-described New York City Police Department vehicle made the afore-described maneuver and came to the stop at the location where the Plaintiff was standing and speaking with the several other individuals then at the location.

45. A male, uniformed New York City Police Officer, who appeared to be Asian (or otherwise) and who appeared to be in the front passenger seat, exited the vehicle, approached the Plaintiff and others –who were otherwise then engaged in reasonable, conversational tone discussion among themselves and were doing nothing improper or unlawful or which could have appeared to be improper or unlawful, and asked for the Plaintiff and other individuals to provide identification.

46. Each of the individuals, including the Plaintiff and the Plaintiff's younger brother, James, provided the Officer with the

requested identification.

47.  As the uniformed New York City police officer was taking the identification documents from the Plaintiff and the others then at the location, the driver of the marked New York City police vehicle, who was a white uniformed male New York City police officer, exited the vehicle and approached the Plaintiff and others who were then providing identification to the other then present officer. It is believed that the white male uniformed New York City police office is Defendant Kosta Demetrakopoulos who is referenced in a May 29, 2010 New York County Criminal Court felony Complaint as the "informant". It is believed that the other officer then present is Defendant Emmanuel Valerio.

48.  In what to the Plaintiff appeared to be an aggressive and hostile tone, the white uniformed New York City Police Officer stated, in substance:  if any of you motherfuckers say anything or try and leave, I am going to kick the shit out of you.

49.  The Plaintiff responded, reasonably both in substance and in tone, that:  he (the officer) didn't have to do anything to anyone standing there because they (the people then present) were all grown men, they were on public property (the sidewalk), they weren't going anywhere (meaning that they were not leaving), they had complied by providing identification to them (the officers) as they had been directed to do by the other uniformed New York City police officer (then present), and that the officers should just go ahead and check the identification.

50.    The white uniformed New York City police officer in turn responded to the Plaintiff and the others then present directing that the Plaintiff and others, who were standing by the curb in the vicinity of the vacant lot and the Plaintiff's residence, to move to the fence which was proximate to the vacant lot at the West 163rd Street location that, itself, was in the near proximity of the Plaintiff's residence next door to the vacant lot.

51.    The Plaintiff and other individuals complied with the white uniformed New York City police officer's directive to move toward the fence by the vacant lot, a short distance from where the Plaintiff and others were standing by the curb line.

52.    In the mean time, the other then present uniformed New York City police officer was standing in the vicinity addressing the various identifications that the Plaintiff and others had provided to him.

53.    One of the individuals, Ambers Jackson, was smoking a cigarette and the white uniformed New York City police officer directed him to put the cigarette out.

54.    Ambers Jackson complied by dropping the cigarette on the ground in the vicinity of where he was standing and where the white uniformed New York City police officer was standing.

55.    After Ambers Jackson dropped the cigarette on the ground, the white uniformed New York City police officer immediately handcuffed said Ambers Jackson and placed him, in a sitting position, on the sidewalk in the vicinity of the curb.

56.   The Plaintiff and others asked in substance: what was the problem.

57.   The Plaintiff asked because no one, then present, had done anything wrong or unlawful and all present had complied with the directives given, first by the Asian (or other) appearing uniformed New York City police officer and, then, by the white uniformed New York City Police Officer.

58.   The white uniformed New York City police officer simply responded, in substance: that he had arrested Ambers Jackson and that he didn't feel like writing any tickets so he was going to lock all of you mother fuckers up.

59.   The white uniformed New York City police officer than asked who didn't have identification and the Plaintiff's younger brother, James, indicated that his identification was not a New York State issued identification at which point in time the white uniformed New York City Police officer took hold of the arm of the Plaintiff's younger brother, James, and propelled him to the location where Ambers Jackson was then seated in handcuffs.

60.   As such occurred, the Plaintiff turned toward the white uniformed New York City police officer and the Plaintiff's younger brother James –where James was then situated.

61.   The Plaintiff was observing what the white uniformed New York City Police Officer was then doing to and with the Plaintiff's younger brother, James.

62.   As the Plaintiff was standing at the location and observing what was transpiring –without saying anything or otherwise acting inappropriately, offensively or in any way unlawfully- the white uniformed New York City Police Officer stated to the Plaintiff, in substance: what the fuck do you think you are doing.

63.   The Plaintiff, reasonably and appropriately, responded in substance: I am watching what is going on and I am entitled to do so.

64.   At that point –thereafter and without any fore-warning or justification, the white uniformed New York City police officer grabbed the Plaintiff by the Plaintiff's right arm.

65.   The Plaintiff moved backward as the white uniformed New York City Police Officer grabbed his arm since the Plaintiff did not understand why the white uniformed New York City Police Officer was grabbing his arm in as much as the Plaintiff had done nothing whatsoever that was hostile, unlawful, or in any other way offensive or unreasonable.

66.   The white uniformed New York City Police Officer then continued to proceed at the Plaintiff, with his fists up and outward.

67.   Without any fore-warning whatsoever and without any justification whatsoever on the part of the white uniformed New York City police officer and to the utter shock of the Plaintiff, the white uniformed New York City police officer struck the Plaintiff in the Plaintiff's face busting the Plaintiff's bottom lip.

68.   The Plaintiff backed away in order to protect himself from

the assault and battery committed upon him by the white uniformed New York City Police Officer.

69.   As he backed away, the Plaintiff recalls and believes that the Asian (or otherwise) appearing uniformed New York City police officer was somewhere in the vicinity in back of the Plaintiff.

70.   The white uniformed New York City police officer, who was perhaps four to five feet from the Plaintiff who was backing away after being assaulted by the white uniformed New York City police officer, then sprayed the Plaintiff with a substance.

71.   The Plaintiff recalls and believes that the white uniformed New York City police officer struck the Plaintiff with a baton on several occasions.

72.   The Plaintiff recalls and believes that he was hit with the baton by the attacking white uniformed New York City police officer in the shoulder area and across the side of the Plaintiff's face and in the chest area.

73.   The Plaintiff was backing away and leaning backwards as the assault was being made against him by the white uniformed New York City police officer so as to try and avoid being struck by the white uniformed New York City police officer.

74.   At or about this time, the Plaintiff felt himself being struck in his neck area and from the back by, he believes, the other uniformed New York City police officer then present.

75.   It was during this period, the Plaintiff believes that he was

struck with a baton by the white police officer.

76.   The Plaintiff, in order to protect himself from the unjustified assault and battery which was then being committed against him by both the white uniformed New York City police officer and the other then present uniformed New York City police officer, struck the advancing and assaulting white uniformed New York City police officer, again in order to protect himself from the assault being perpetrated upon the otherwise defenseless Plaintiff by the white uniformed New York City police officer.

77.   At or about the same time, the defenseless Plaintiff, in order to defend himself from the assault which was being directed at him by the other than present uniformed officer, struck at him, as well.

78.   The white uniformed New York City police officer, who had fallen, got back up and rushed at the Plaintiff causing both the Plaintiff and the white uniformed New York City police officer to fall into or against a vehicle and ultimately down to the ground, in proximity to the vehicle, where they were inter-locked by the nature of how they fell.

79.   As the Plaintiff tried to get up and extricate himself from the white uniformed New York City police officer, the white uniformed New York City police officer pulled the Plaintiff's pants halfway down and pulled off one of the Plaintiff's shoes all in what the Plaintiff perceived was an effort by the white New York City police officer to pull the Plaintiff back down on the ground.

80.   The Plaintiff recalls and believes that at or about this time, the Plaintiff was again struck by the other than present uniformed New York City Police Officer.

81.   None of those otherwise present were involved in what was transpiring but, it is believed, were observing what took place.

82.   In addition, it is believed that others were then on the location observing all that took place including the Plaintiff's girlfriend and including individuals who had no relationship whatsoever to the Plaintiff and who, it is believed, had been observing, from early on if not the outset, what was transpiring.

83.   At or about that point and during the period of time  in which all of the foregoing transpired, other New York City police officers, both uniformed and plain clothes, came on the scene.

84.   The Plaintiff was handcuffed and then placed in a marked New York City Police Department vehicle.

85.   After being placed in the backseat of police vehicle, a female New York City Police Officer, believed to be of the rank of sergeant, stood outside of the vehicle blocking sight into the vehicle from outside of the vehicle.

86.   Thereafter, the Asian (or otherwise) appearing uniformed New York City police officer entered into the backseat of the police vehicle where the Plaintiff sat handcuffed; and said police officer struck the Plaintiff several times in and about the Plaintiff's face and in and about the Plaintiff's body and, then, exited the vehicle.

87.  Uniformed New York City police officers then got into the driver's seat and the front passenger seat and transported the Plaintiff to what he believes and he understands was the 33rd Precinct where he was held for many hours.

88.  When the Plaintiff entered into the 33rd Precinct it was apparent that he had been struck in or about the face area and/or body and that the Plaintiff had suffered some injury.

89.  The Plaintiff was processed at the Precinct.

90.  The Plaintiff was photographed and fingerprinted.

91.  The Plaintiff was transported to Manhattan Central Booking on Saturday morning, May 29, 2010.

92.  It was apparent, when the Plaintiff was transported to Manhattan Central Booking and when he arrived at the Manhattan Central Booking facility, that the Plaintiff had been injured.

93.  Accordingly, the Plaintiff was transported from Manhattan Central Booking to Bellevue Hospital where the Plaintiff was examined.

94.  The Plaintiff was then returned Manhattan Central Booking.

95.  On Saturday evening, May 29, 2010, the Plaintiff appeared at an arraignment where a bail in the amount of approximately $30,000.00 was set.

96.  The bail was met and the Plaintiff was released.

97.  The Plaintiff was charged with a felony assault on a New York City Police Officer Kosta Demetrakopoulos, Shield # 23156, whom it is believed is the previously mentioned white uniformed New York City

police officer.

98. New York City Police Officer Jeremy Veit, Shield # 11814, stated in a Criminal Court Complaint, executed under penalty of law on May 29, 2010, that Police Officer Kosta Demetrakopoulos informed him [Jeremy Veit] that the Plaintiff "did repeatedly strike informant [Kosta Demetrakopoulos] in the face with a closed fist"; that the Plaintiff "did grab informant's head and repeatedly strike informant's head against the concrete and against the number [sic] of a car"; and that the Plaintiff's "conduct caused [Kosta Demetrakopoulos] to suffer a broken nose, a laceration on [his forehead...[and] to receive stitches in [sic] to the face".

99. Such was not true as described because whatever injury, if any, which was suffered by Kosta Demetrakopoulos, was the result of the Plaintiff defending himself from the unjustified, unnecessary, unreasonable, and excessive use of force and the unjustified and unlawful assault and battery employed by the white male uniformed New York City police officer, believed to be Kosta Demetrakopoulos, against the Plaintiff (as described above) resulting in serious injury to the Plaintiff and, in addition, to the unlawful assault and battery and excessive and unreasonable and unnecessary and unjustified force utilized by the Asian (or otherwise) uniformed New York City police officer against the Plaintiff (as described above).

100. The Plaintiff did not affirmatively assault and batter Kosta Demetrakopolous and he did not affirmatively assault and batter

the Asian (or otherwise) uniformed New York City Police Officer but rather the Plaintiff utilized reasonable and justified and necessary defensive force to defend himself from an unjustified assault and battery against him by Kosta Demetrakopoulos and the Asian (or otherwise) uniformed New York City police officer.

101. The Defendants knew or should have known that the information set forth in the Criminal Court felony Complaint was not true, was out of context, and was false.

102. In other words and as the Defendants knew or should have known, but declined to state such in the felony Complaint, the Plaintiff employed reasonable and proportionate defensive force to defend himself from the assault and battery and excessive, unreasonable, unjustified force employed by the Defendants against the Plaintiff so that any injury that was caused to any police officer was the result not of an unjustified assault on them by the Plaintiff but rather as a consequence of the Plaintiff defending himself against the Defendants use of unreasonable, unnecessary, unjustified, unlawful, excessive force against the Plaintiff and their assault and battery against the Plaintiff.

103. The Defendants, in covering up for their unlawful, unreasonable, unnecessary, excessive, and unjustified use of force and unjustified assault and battery against the Plaintiff, were intentionally misleading in the felony Complaint and fabricated their Criminal Court felony Complaint accounting, under penalty of law, in

preferring and pursuing a felony crime Complaint against the Plaintiff when, individually and collectively, they knew that there was no basis for preferring the felony Complaint or any criminal complaint against the Plaintiff for any unlawful conduct by the Plaintiff since the Plaintiff engaged in no unlawful conduct and the Defendants knew such.

104.   It is believed, too, that the still unknown female New York City Police Department Sergeant participated in unjustified and unlawful conduct which knowingly allowed and permitted and authorized the Asian (or otherwise) appearing uniformed New York City Police Officer to engage in assaultive conduct against the Plaintiff while the Plaintiff was seated, in a rear handcuffed position, in the backseat of a New York City Police Department patrol vehicle before the Plaintiff was transported from the location on West 163rd Street to the 33rd Precinct.

105.   On Sunday, May 30, 2010, the Plaintiff was briefly interviewed by New York City Police Department Internal Affairs Bureau personnel outside of the Plaintiff's residence and in the vicinity of vacant lot where the Plaintiff was, without justification, assaulted and battered by the Defendants and subjected to excessive, unreasonable, unjustified, and unnecessary force [as described].

106.   The Plaintiff is unaware of how it came to be that the New York City Police Department Internal Affairs Bureau personnel came to undertake to interview the Plaintiff upon his release from Court after the Plaintiff's arraignment except to believe that, because the

Plaintiff was transported to Bellevue Hospital from Manhattan Central Booking, a notification was made to the New York City Police Department Internal Affairs Bureau ("IAB") of the fact that there was an injured individual in the custody of the New York City Police Department that was requiring that individual –the Plaintiff, to be transported to a hospital facility for examination and services, thereby triggering an investigation.

107. On the other hand, notwithstanding that the Plaintiff believed that the IAB investigation was the consequence of the foregoing event, it has since come to his attention that the investigation undertaken by the IAB was not, per se, into the unprovoked, unjustified, unreasonable, and unnecessary and excessive assault perpetrated against the Plaintiff by New York City Police Officers (as described), but rather it was into the inter-related fact that Ambers Jackson, who had been arrested and placed in handcuffs (as described above)at or about the time of the assault by New York City police officers on the Plaintiff, was permitted by New York City line and command police officers at the location to leave the location where the assault on the Plaintiff took place and where Ambers Jackson had been arrested and handcuffed.

108. It is believed that, although said Ambers Jackson was left at the scene and/or allowed to walk away from the location by New York City line and command police officers and that situation was not then immediately addressed by the New York City Police Department (that an

individual had been arrested but was not being processed because that individual was no longer present), no one in the New York City Police Department was held accountable for that serious dereliction of duty and police function.

109.   Furthermore and as noted and notwithstanding that there was physical violence taken against the Plaintiff and said violence was inter-related to the fact that said Ambers Jackson was eventually able to walk away from the location this despite the fact that Ambers Jackson had been arrested and handcuffed, the Internal Affairs Bureau elected not to investigate the violence perpetrated against the Plaintiff by the Defendant Officers notwithstanding that it was, for all intent and purposes, impossible not to investigate police officer conduct with respect to Plaintiff's situation in the context of addressing police officer conduct respecting Ambers Jackson. They are necessarily part and parcel of the same transactional event.

110.   Moreover and in this regard, Captain Andrew Ventrella, Lieutenant Osvaldo Nunez, Sergeant Timothy Conlon, and Deputy Inspector Joseph Dowling were, it is believed, part of the command structure at the 33rd Precinct on May 28, 2010, were part and parcel of the supervision of the May 28, 2010 event out of which this litigation derives even if each was not present at the time of the assault on the Plaintiff.

111.   It is further believed that each of the foregoing individuals nonetheless arrived at the location of the May 28, 2010 event and/or

became aware of the events.

112.  Each of the individuals knew or should have known that the Plaintiff was subjected to an assault and battery at the event (as described).

113.  Notwithstanding such, each of the individuals undertook to ignore the fact of the unprovoked, unjustified, excessive, unreasonable assault by police officers under their respective command supervision and to otherwise ignore the dereliction of duty by officers under their command related to the "escape" of Ambers Jackson as part and parcel of the May 28, 2010 assault on the Plaintiff by New York City Police Officers under their command.  In fact, each of the individuals affirmatively sanctioned the false accounting that the Plaintiff, rather than being a victim of excessive force and an assault by New York City police officers under their command supervision, was the perpetrator of an assault upon New York City police officers.

114. The actions and conduct of the afore-named supervisors and command officers were reckless and deliberately indifferent and part and parcel of the efforts to cover up the unlawful conduct of police officers, under their command and supervision, who assaulted the Plaintiff and otherwise allowed an individual, who had been arrested and handcuffed, to leave the location.

115.  By such failure and along with the fact that the IAB investigation and ultimately the City of New York held no one responsible for the Ambers Jackson situation or the assault upon the

Plaintiff by the Defendant New York City Police Officers, the New York City Police Department and its command and management personnel and the City of New York sanctioned and condoned and approved the misconduct of New York City Police Officers arising out of the May 28, 2010 event including the assault on and excessive force utilized against the Plaintiff by New York City police officers.

116.  In this regard as well, the City of New York was aware or should have been aware of the misconduct of its line and command police officers at the May 28, 2010 event, including the assault on and utilization of excessive force against the Plaintiff by New York City police officers at the May 28, 2010 event,  because on May 31, 2010, an individual (not the Plaintiff or Ambers Jackson), Christopher Vidal, filed a Complaint with the IAB which was, rather than incorporated into the IAB investigation then on-going into the Ambers Jackson aspect of the May 28, 2010 event, was referred to the New York City Civilian Complaint Review Board ("CCRB") on June 2, 2010.

117.  Moreover in this regard, on June 7, 2010, Ambers Jackson, himself, filed a Complaint with the CCRB regarding the May 28, 2010 event respecting, it is believed, the unjustified and excessive use of force against the Plaintiff.

118.  Rather than that matter and the other inter-related matter being referred back to the IAB to investigate the alleged wrong-doing in the context of its already on-going investigation since they were part and parcel of the same transactional event and one could not

properly and effectively be addressed without addressing both, CCRB did some ostensible minimal investigation.  However and because the one individual could not be located and Ambers Jackson did not provide any further back up information beyond his initial complaint to the CCRB in which he alleged that force had been wrongly employed by New York City Police Officers against the Plaintiff, the CCRB's investigation was concluded on or about July 21, 2010 without any recommendation or any other action being taken against any police line or command officer.

119. The City of New York and the afore-mentioned supervisors and command officers elected to close its eyes to the allegations of which the City of New York and the identified command and line officers were actually aware or should have been aware: that the Plaintiff had been the subject of an assault and the utilization of excessive force by New York City Police Officers.

120.  The Defendant City of New York and the other Defendant line and command officers were consciously engaged in a process of circling the weapons to insulate the Officers who had been involved with the Plaintiff and had engaged in excessive force against and an assault on the Plaintiff and who had otherwise been engaged in dereliction of duty when Ambers Jackson was able to leave the location despite having been arrested and placed in handcuffs on May 28, 2010 in the context of the over-all event where the Plaintiff was subjected to unlawful force.

121.  Significantly and in the context of the IAB investigation into the Ambers Jackson aspect of the event (as described), the IAB was aware, since its report into its investigation notes such, that Defendant Demetrakopolous had been placed on what is described as a Level 1 Force Monitoring status as a consequence of having three (3) CCRB complaints related to the use of excessive forced, in a one year period, this, apparently, prior to the May 28, 2010 event when the IAB, the CCRB, the Defendant City of New York, and the Defendant line and command officers were aware or should have been aware of the fact that Defendant Demetrakopolous had been accused and/or was involved in another incident of excessive force against a citizen.

122.  Moreover, it is believed that the Defendant City of New York and the Defendant line and command officers were aware or should have been aware that Defendant Valerio had a history within the CCRB and yet ignored such in the context of the May 28, 2010 event when it sought to whitewash the wrongful and otherwise unlawful conduct of its officers, including the Defendant Officer, in the entire May 28, 2010 matter, including the excessive use of force by the Defendants against the Plaintiff.

123.  The Defendant City of New York and the identified Defendants employed and pursued what the Plaintiff believes to be a reckless and deliberately indifferent policy and practice in its investigation (or lack of investigation) into allegations of unlawful conduct by its police officers including the unlawful conduct of its police officers

in the event of May 28, 2010 (including that aspect of the event in which the Plaintiff was subjected to excessive force by the Defendant Officers herein).

124.   Such was part and parcel of the Defendant City's reckless and deliberately indifferent policy and practice and custom in the monitoring, supervision, and oversight of Defendant Demetrakoplous, this notwithstanding that Defendant Demetrakopolous was supposedly on a special force monitoring status.

125.   In fact, the Defendant City's policy and practice and the policy and practice and conduct of the Defendant line and command officers was one of closing their eyes to the excessive force employed against the Plaintiff by New York City police officers and, by such, to sanction that unlawful conduct.

126.   Eventually, the Plaintiff, himself, gave notice that, based on the felony complaint which had been preferred against him, he was prepared to testify before any Grand Jury and, ultimately, the Plaintiff, in fact, testified before the Grand Jury that was considering the unjustified and fabricated criminal allegations preferred against the Plaintiff by the Defendants.

127.   It is believed that some of the Defendants testified before the Grand Jury including, it is believed, Defendants Demetrakopolous and Valerio.

128.   It is believed, too, that at least one independent person, who did not know the Plaintiff whatsoever and who came upon the scene

and observed the incident, testified before the Grand Jury which had been convened to consider the charge preferred against the Plaintiff.

129. It is believed, too, that the individual was so upset about what she had observed, from the outset of the incident through its conclusion when the Plaintiff was arrested and taken into custody, that she, herself, contacted law enforcement.

130. It is believed that the individual testified in a manner and fashion and in substance which was favorable to the Plaintiff and adverse to the Defendants and that described an incident in which the Plaintiff was not in any way whatsoever the aggressor but rather an incident in which the Defendant Officers were the unjustified aggressors and in which the Plaintiff simply responded, defensively and reasonably, to protect himself from the unjustified assault and battery perpetrated against him by the aggressor Defendants and the unnecessary, unreasonable, unjustified, and excessive force employed by the aggressor Defendants against the Plaintiff.

131. The City of New York, through its agents and employees, knew or should have known that an independent witness had observed the unlawful conduct of its Officers and had testified, under oath before a Grand Jury in said respect; yet the City of New York took no action whatsoever to address such, including undertaking to locate her and to interview her (this notwithstanding that the City's agents knew or should have known her name and location); and the City of New York declined to sanction its Officers for their wrongful conduct, this

notwithstanding that the witness's testimonies supported the assertions of which the City of New York was aware or should have been aware related to the excessive force of its Officers against the Plaintiff.

132.   In that regard, it is believed that the independent witness, who had, it is believed, observed the events at the location from the outset, went up to a police officer, who had arrived at the scene after it is believed the Plaintiff had been assaulted by police officers and had been arrested by police officers, and informed the officer that she had observed the incident and was available to the police if they wanted the information about what she had observed.

133.   It is believed that the officer informed the witness to get the fuck out of there.

134.   The witness then gave someone her telephone number and informed that individual that, if she was needed at the Precinct, she would come to the Precinct.

135.   Subsequently on that evening, the witness received a telephone call to come to the Precinct.

136.   As she was preparing to leave her residence, which was in the immediate proximity of the event, she received another call not to come to the Precinct.

137.   It is believed that the supervisory command personnel  at the 33rd Precinct consciously chose to avoid interviewing the witness because, if she had been interviewed and provided the information, it

would have confirmed and become known to the command personnel that the Plaintiff had been assaulted by police officers and that the individual in handcuffs, who had allegedly left the location after being arrested and handcuffed, did so because of the chaos caused by police officers at the location commencing with the assault by police officers on the Plaintiff.

138. On March 28, 2011, the New York County Assistant District Attorney, who was involved in this matter from the outset, notified the Plaintiff, in writing, "that Grand Jury 5A for the 3rd Term, having heard evidence on the above-referenced felony complaint, has voted a dismissal of the charge against you in connection with that incident".

139. The criminal proceedings, which were instituted by the Defendants in conjunction with the New York County District Attorney's office but without which the District Attorney's Office could not have pursued the criminal proceedings, were dismissed and no lesser charge was preferred against the Plaintiff.

140. In other words, the Plaintiff received a favorable merits based exoneration with respect to the alleged wrongful conduct against the Defendant Officers and, at or about March 28, 2011, he received a merits based favorable dismissal of the criminal proceedings which were maliciously instituted by the Defendants against the Plaintiff.

141. Notwithstanding that the Defendant City of New York and the Defendant command officers and supervisors knew or should have known that the Grand Jury elected not to indict the Plaintiff for an alleged

serious and aggravated assault on a police officer, this notwithstanding that the City's police officers testified before the Grand Jury, the City ignored such and, per its policy and practice, recklessly and indifferently sanctioned and approved the unlawful conduct of its Officer this notwithstanding that the City of New York knew or should have known that Defendant Demetrakopolous was on a force monitoring status because of the number of complaints which had been made against him in the year prior to the May 28, 2010 event for his use of excessive and unreasonable and unnecessary force.

142.   The Plaintiff never engaged in any criminal conduct or other improper, wrongful, illegal conduct.

143.   Moreover, no reasonable police officer could have believed that the Plaintiff had engaged in any criminal conduct or other improper, wrongful, unlawful conduct.

144.   There was no probable cause for the arrest or criminal prosecution of the Plaintiff and the Defendants knew or should have known that such was the case.

145.   Furthermore, no reasonable police officer could have believed that there was probable cause for the arrest and prosecution of the Plaintiff.

146.   The Defendants fabricated the accounting in order to achieve a non legitimate, non law enforcement collateral end: the cover up of the assault and battery on the Plaintiff and the cover up of their excessive, unreasonable, unjustified, unnecessary utilization of

force against the Plaintiff; and, otherwise, to cover-up the other problematic conduct of police officers in allowing said Ambers Jackson to leave the scene of the event of the assault and battery against the Plaintiff, this despite Jackson, himself, had been arrested and placed in handcuffs.

147. The Plaintiff was subjected to malicious abuse of criminal process.

148. The Plaintiff was subjected to malicious prosecution.

149. The Plaintiff was subjected to excessive and unnecessary force in association with his false and unlawful arrest and detention.

150. The Plaintiff suffered physical injuries and emotional and psychological trauma and mental anguish. The Plaintiff had difficulty sleeping after the event and otherwise had intermittent up-setting dreams about the event. The Plaintiff was frightened when he saw police officers.

151. The Plaintiff continues to suffer serious residual emotional and psychological trauma and mental anguish.

152. The Plaintiff made an attempt on his own life in the summer of 2010 after the incident as described above.

153. The Plaintiff was hospitalized for approximately one month as a consequence of the unsuccessful effort to take his life.

154. The Plaintiff was having an extraordinarily difficult dealing with the assault taken against him by the Defendants causing him to try and take his own life.

155.  In addition to the serious emotional and psychological trauma and mental anguish that the Plaintiff suffered and continues to suffer because of the incident, the Plaintiff suffered and continues to suffer serious physical injury including a pinched nerve in his neck area and shoulder area and including injury to his back area.

156.  The Plaintiff also suffered serious deep contusions to and about his body.

157.  The New York City Police Officers, who arrested the Plaintiff and who otherwise subjected him to the conduct described herein and who otherwise sanctioned said conduct, are agents and employees of the City of New York. Notwithstanding the wrongful and unlawful and unconstitutional actions and conduct of said New York City Police Officers, said actions and conduct were taken in the course of the performance of their duties and functions as a New York City Police Officer and as agents and employees of the City of New York and incidental to the otherwise lawful performance of their duties and functions as a New York City Police Officer and as an agent and employee of the City of New York.

158.  It is believed that there were New York City Police Department Command Officers who authorized and sanctioned the conduct practiced and taken against the Plaintiff and which propelled the actions and conduct, in the component parts thereof and their totality, taken against the Plaintiff.

159.  It is believed that the policies and practices of the City

of New York, including those stop and frisk policies and practices which it is believed propelled the Defendant officers in this case to stop their vehicle and get out of their vehicle and approach the Plaintiff and others even though the Plaintiff and others were doing nothing suspicious to justify a stop and detention, creates a situation where people, who were otherwise doing nothing impermissible, are subjected to stops and detentions and arrests and denied their right to freely and lawfully assemble and to otherwise simply observe action being taken by Police Officers toward other individuals and/or to just be present on a public street doing nothing otherwise unlawful or improper or which could in any way be deemed to be unlawful or improper.

160.  It is believed that the quality of life and stop and frisk policies and practices of the City of New York –and the training or lack of training policies and practices associated therewith, propelled the challenged conduct herein without which the Defendant Officers would not have engaged in any and all aspects of their field activities commencing with the request for identification and continuing thereafter.

161.  The force monitoring policy and practice of the City of New York is such that, notwithstanding that there is ostensibly a program for the force monitoring of Officers by the City of New York, the policy is recklessly and indifferently employed and deployed by the City of New York such that, because Officers know such, they are propelled, even while on force monitoring, to continue to engage in such conduct,

as was the case in this matter (as described).

162.   Moreover, the policy and practice of the City of New York into the investigation of wrongful conduct of its Officer is such that, notwithstanding that there are ostensible investigatory programs, the policy and practice is recklessly and indifferently employed and deployed by the City of New York so that, because Officers know such, they are not deterred in engaging in wrongful conduct and are therefore propelled to engage in such knowing, as they do know, that they will suffer no adverse consequences except in an extraordinarily rare circumstance often dictated by massive public exposure of what is an extraordinary use of force, for examples, the use of torture or a shooting death.

163.   The Plaintiff was unlawfully stopped and detained, falsely arrested [without probable cause], subjected to excessive and unnecessary force, subjected to malicious prosecution, and subjected to malicious abuse of criminal process [for the collateral purpose of covering up their otherwise unlawful conduct and not for the legitimate law enforcement purpose of an arrest] and, otherwise, to retaliatory conduct because of the exercise of his First Amendment guaranteed right of free assembly and protected speech activity including excessive and unnecessary detention and including excessive and unreasonable and unnecessary conditions of confinement.

164.   It is believed that the policies and practices as described, including but not limited to the quality of life crime enforcement

initiatives and policies and practices and including the stop and frisk initiatives, policies, and practices, have a disproportionate impact on African American individuals.

165. The actions and conduct of the Officers, as agents and employees of the City of New York, and the policies and practices which propelled those actions and conduct violated the Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

166. The actions and conduct and policies and practices violated the Plaintiff's rights under the laws and Constitution of the State of New York.

167. The actions and conduct and policies and practices were otherwise negligent and the proximate cause of the Plaintiff's injuries.

168. The amount and value of the injuries and damages suffered by the Plaintiff have not yet been calculated.

169. The Plaintiff seeks both compensatory and punitive damages and, in addition and in order to promote the interests of justice and to secure full and complete relief for the Plaintiff declaratory and injunctive relief.

170. The Plaintiff has no other adequate remedy at law but for the institution of this litigation.

## V. CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION

171.  The Plaintiff reiterates Paragraph #'s 1 through 170 and incorporates such by reference herein.

172.  The Plaintiff was unlawfully stopped and detained and otherwise falsely arrested and falsely imprisoned in violation of the Plaintiff's rights under the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and Fourth Amendment to the United States Constitution.

173.  The Plaintiff suffered injuries and damages.

### B. SECOND CAUSE OF ACTION

174.  The Plaintiff reiterates Paragraph #'s 1 through 173 and incorporates such by reference herein.

175.  The Plaintiff was, _inter alia_, unlawfully stopped and detained and otherwise falsely arrested and falsely imprisoned in violation of the laws and Constitution of the State of New York.

176.  The Plaintiff suffered injuries and damages.

### C. THIRD CAUSE OF ACTION

177.  The Plaintiff reiterates Paragraph #'s 1 through 176 and incorporates such by reference herein.

178.  The Plaintiff was subjected to malicious abuse of criminal process [for an ulterior objective other than the legitimate enforcement of the law but rather to cover up for the Defendants unlawful and wrongful and use of excessive, unreasonable, unnecessary and unjustified force against the Plaintiff and their assault and

battery on the Plaintiff] in violation of the Plaintiff's rights under the laws and Constitution of the State of New York and under the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the Fourteenth Amendment to the United States Constitution.

179. The Plaintiff suffered injuries and damages.

### D. FOURTH CAUSE OF ACTION

180. The Plaintiff reiterates Paragraph #'s 1 through 179 and incorporates such by reference herein.

181. The Plaintiff was subjected to malicious abuse of criminal process in violation of the Plaintiff's rights under the laws and Constitution of the State of New York.

182. The Plaintiff suffered injuries and damages.

### E. FIFTH CAUSE OF ACTION

183. The Plaintiff reiterates Paragraph #'s 1 through 182 and incorporates such by reference herein.

184. The Plaintiff was subjected to malicious prosecution in violation of the Plaintiff's rights under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

185. The Plaintiff suffered injuries and damages.

### F. SIXTH CAUSE OF ACTION

186. The Plaintiff reiterates Paragraph #'s 1 through 185 and incorporates such by reference herein.

187. The Plaintiff was subjected to malicious prosecution in

violation of his rights under the laws and Constitution of the State of New York.

188.   The Plaintiff suffered injuries and damages.

## G. SEVENTH CAUSE OF ACTION

189.   The Plaintiff reiterates Paragraph #'s 1 through 188 and incorporates such by reference herein.

190.   The challenged policies and practices and actions and conduct were racially discriminatory.

191.   Such violated the Plaintiff's rights under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

192.   The Plaintiff suffered injuries and damages.

## H.   EIGHTH CAUSE OF ACTION

193.   The Plaintiff reiterates Paragraph #'s 1 through 192 and incorporates such by reference herein.

194.   The policies, practices, action, and conduct were racially discriminatory in violation of the laws and Constitution of the State of New York and the City of New York.

195.   The Plaintiff suffered injuries and damages.

## I.   NINTH CAUSE OF ACTION

196.   The Plaintiff reiterates Paragraph #'s 1 through 195 and incorporates such by reference herein.

197.   The Plaintiff was subjected to unnecessary, excessive, unprovoked, unreasonable, unnecessary, and overly aggressive physical

force in violation and of the Plaintiff's right under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

198. The Plaintiff suffered injuries and damage.

## J. TENTH CAUSE OF ACTION

199. The Plaintiff reiterates Paragraph #'s 1 through 198 and incorporates such by reference herein.

200. The Plaintiff was subjected to assault and battery in violation of the Plaintiff's rights under the laws and Constitution of the State of New York.

201. The Plaintiff suffered injuries and damages.

## K. ELEVENTH CAUSE OF ACTION

202. The Plaintiff reiterates Paragraph #'s 1 through 201 and incorporates such by reference herein.

203. The Plaintiff was subjected to unreasonable and unnecessary and excessive terms and conditions of his detention in violation of his rights under the Fourth Amendment to the United States Constitution.

204. The Plaintiff suffered injuries and damages.

## L. TWELFTH CAUSE OF ACTION

205. The Plaintiff reiterates Paragraph #'s 1 through 204 and incorporates such by reference herein.

206. The Plaintiff was subjected to unreasonable and unnecessary and excessive terms and conditions of his detention, including its

length and including how he was treated, in violation of the Plaintiff's rights under the laws and Constitution of the State of New York.

207.  The Plaintiff suffered injuries and damages.

## M. THIRTEENTH CAUSE OF ACTION

208.  The Plaintiff reiterates Paragraph #'s 1 through 207 and incorporates such by reference herein.

209.  The Defendant City's policies and practices propelled the actions and conduct taken herein.

210.  The Defendant City's policies and practices violated the Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

211.  The Plaintiff suffered injuries and damages.

## N. FOURTEENTH CAUSE OF ACTION

212.  The Plaintiff reiterates Paragraph #'s 1 through 211 and incorporates such by reference herein.

213.  The actions, conduct, policies and practices were negligent and the proximate cause of the Plaintiff's injuries and damages.

214.  The Plaintiff suffered injuries and damages.

## O. FIFTEENTH CAUSE OF ACTION

215.  The Plaintiff reiterates Paragraph #'s 1 through 214 and incorporates such by reference herein.

216.  Pursuant to and under federal claim jurisdiction, the City of New York is the real party in interest in this litigation and the

City of New York should be held liable and responsible, pursuant to the federal claims jurisdiction, for the unlawful and unconstitutional conduct of its agents and employees pursuant to and under the doctrine of respondeat superior [vicarious liability].

217.   The Plaintiff suffered injuries and damages.

## P.  SIXTEENTH CAUSE OF ACTION

218.   The Plaintiff reiterates Paragraph #'s 1 through 217 and incorporates such by reference herein.

219.   Under pendent jurisdiction and with respect to any pendent State law claims, the City of New York should be held liable and responsible for the unlawful conduct of its agents and employees pursuant to and under the doctrine of respondeat superior [vicarious liability].

220.   The Plaintiff suffered injuries and damages.

## Q. SEVENTEENTH CAUSE OF ACTION

221.   The Plaintiff reiterates Paragraph #'s 1 through 220 and incorporates such by reference herein.

222.   The Plaintiff was retaliated against because of the reasonable exercise of his First Amendment rights in violation of 42 U.S.C. Section 1983 and the First Amendment to the United States Constitution.

223.   The Plaintiff suffered injuries and damages.

## R.  EIGHTEENTH CAUSE OF ACTION

224.   The Plaintiff reiterates Paragraph #'s 1 through 223 and

incorporates such by reference herein.

225. The Plaintiff was retaliated against because of the reasonable exercise of his rights of speech and assembly in violation of his rights under the laws and Constitution of the State of New York.

226. The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction herein and thereafter:

[a] Assume pendent party and pendent claim jurisdiction.

[b] Enter appropriate declaratory and injunctive relief.

[c] Award appropriate compensatory and punitive damages in an amount to be defined and determined.

[d] Award reasonable costs and attorney's fees.

[e] Award such other and further relief as the Court deems appropriate and just.

[f] Convene and empanel a jury.

DATED: New York, New York
       December 29, 2011

                              Respectfully submitted,

                              /s/James I. Meyerson___
                              JAMES I. MEYERSON
                              64 Fulton Street-Suite # 502
                              New York, New York 10039
                              [212] 226-3310
                              [212] 513-1006/FAX
                              jimeyerson@yahoo.com
                              ATTORNEYS FOR PLAINTIFF
                              BY:_____

TO:
MATTHEW WEIR, ESQ.
Assistant Corporation Counsel
City of New York
Department of Law
Special Federal Litigation Division
100 Church Street-3rd Floor
New York, New York 10007
[212] 676-1347
[212] 788-9776/FAX
mweir@law.nyc.gov
ATTORNEY FOR DEFENDANT PARTIES
BY:_____